IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) ) ) | Case No. CV-04-181-S-BLW |
| Plaintiff, | ) ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | ) ) | |
| TOM DYER,* Director, Idaho State Office, Bureau of Land Management; RICK VANDERVOET,* Jarbidge Field Manager, BLM; BUREAU OF LAND MANAGEMENT, an Agency of the United States, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| COMMITTEE FOR THE HIGH DESERT, and WESTERN WATERSHEDS PROJECT, | ) ) ) ) | Case No. CV-02-521-S-BLW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| EDWARD GUERRERO, Jarbidge Field Manager, Bureau of Land Management, K. LYNN BENNETT, Director, Idaho State Office, Bureau of Land Management; KATHLEEN CLARKE, Director, Bureau of Land Management; and BUREAU OF LAND MANAGEMENT, an Agency | ) ) ) ) ) ) ) ) ) | |

**Memorandum Decision and Order – Page 1**

of the United States,                    )
                                         )
                    Defendants.          )
_____)

*Substituted as official defendants per Fed. R. Civ. P. 25(d).

## INTRODUCTION

The Court has before it WWP's motion for preliminary injunction along with

numerous other motions.  The Court held an evidentiary hearing lasting ten days,

and took the motions under advisement.  The parties filed further material on

February 2, 2009, and the motions are now at issue.  The Court's decision is

summarized below in the "Summary" section of this decision, and set forth in detail

in the following Findings of Fact and Conclusions of Law.

## SUMMARY

Western Watersheds Project, an environmental group, brought this lawsuit to

ban livestock grazing in certain areas of the Jarbidge Field Office, 1.4 million acres

of public land managed by the Bureau of Land Management (BLM).  Western

Watersheds Project (WWP) alleges that continued grazing destroys what little

habitat remains for imperiled species like the sage grouse, pygmy rabbit, and

slickspot peppergrass.  All three species are being considered for listing under the

Endangered Species Act, and have been deemed "sensitive species" by the BLM.

**Memorandum Decision and Order – Page 2**

They rely on sage brush habitat that has been in steep decline for years across the west and subject to even more massive losses in the Jarbidge Field Office as a result of the 2007 Murphy Complex Fire.

The Jarbidge Field Office (JFO) extends south from the Snake River into Nevada, and is bounded on the west by the Bruneau River and on the east by Salmon Falls Creek.  The JFO takes in parts of Elmore, Owyhee, and Twin Falls counties in Idaho, and Elko County in northern Nevada.

Livestock grazing is a central activity in the JFO.  The BLM has issued 59 permits authorizing grazing on much of the acreage of the JFO.

In 2007, the Murphy Complex Fire burned over 400,000 acres in the JFO, destroying massive amounts of sage brush habitat used by the sage grouse and pygmy rabbit.  The sage grouse in particular has experienced substantial population declines due to the destruction of its sage brush habitat.

After the fire, the BLM closed the burned areas to grazing and repaired hundreds of miles of fencing.  To determine when the burned areas should be reopened to grazing, the BLM established criteria based on the revival of plants and grasses.

Meanwhile, the BLM has authorized grazing to continue in the unburned areas.  Concerned by the rapidly deteriorating habitat for imperiled species, WWP

**Memorandum Decision and Order – Page 3**

has identified specific areas within the JFO where key habitat remains, and seeks to

ban all grazing in those areas.  WWP argues that the BLM violated federal

environmental laws by failing to adequately take into account the interests of

imperiled species when it decided to authorize grazing in key remaining habitat,

repair fences, and adopt the criteria for reopening burned areas to grazing.  The

BLM, and the ranchers who hold grazing permits, deny these charges and assert that

they are complying with the law.

The Court held ten days of evidentiary hearings, listening to testimony and

examining thousands of pages of documents.  In these Findings of Fact and

Conclusions of Law, the Court finds (1) that three sensitive species in the JFO – the

sage grouse, pygmy rabbit, and slickspot peppergrass – are in serious decline; (2)

that livestock grazing is an important factor in that decline; (3) that the current

management plan (known as a Resource Management Plan or RMP) governing the

JFO is currently being revised by the BLM through the preparation of a

comprehensive Environmental Impact Statement (EIS) designed to describe the

ecological status of the JFO and identify the environmental impacts of activities,

including grazing; (4) that the BLM has committed to preparing new grazing

permits across the JFO when the new RMP is completed; (5) that in its 2008

grazing authorizations, the BLM misinterpreted the existing RMP, especially by

**Memorandum Decision and Order – Page 4**

viewing the RMP's requirements for protection of sensitive species as mere suggestions; (6) that the existing RMP is more protective of sensitive species than it has previously been interpreted by the BLM; (7) that the BLM is directed to correct its interpretation as it considers authorizing grazing for the 2009 grazing season and beyond; (8) that a ban on grazing is not required by law at this point as the Court is confident in the BLM's ability to modify the grazing to be authorized in the 2009 grazing season to accord with the Court's interpretation of the existing RMP; (9) that environmental studies in addition to the ongoing EIS are not required by law at this time; and (10) that the BLM's fencing and closure criteria decisions were consistent with legal requirements.

The details of these decisions are set forth below.  The decision will begin with a review of the litigation background, and will then set forth the Court's Findings of Fact and Conclusions of Law.

## LITIGATION BACKGROUND

On August 1, 2005, the Court issued a decision enjoining grazing on 28 allotments in the Jarbidge Field Office (JFO) until the BLM prepared an Environmental Impact Statement (EIS) evaluating the re-issuance of grazing permits on those 28 allotments.  The Court found it likely that WWP would prevail on its claim that the BLM violated the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321 *et seq*., and the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*.  The Court held that the record raised substantial questions regarding grazing's contribution to the poor condition of the range and the dramatic decline of a sensitive species, the sage grouse.  The intervenors – ranchers who held grazing permits – filed a motion for reconsideration, arguing that the injunction swept too broadly because many of the pastures in the 28 allotments were in good condition.

**Stipulated Settlement Agreement**

Before the motion to reconsider was heard, the parties – including eleven intervenor/ranchers – entered into extensive negotiations that eventually resulted in a Stipulated Settlement Agreement (SSA).  The Court approved the SSA on October 20, 2005 and entered an Order modifying its earlier-filed injunction to reflect the settlement terms.  *See Docket No. 149.*

The SSA contains specific restrictions on 28 allotments, and broad-sweeping changes applying to the entire JFO.  Representative of the latter, the BLM agreed to prepare a revised JFO RMP and supporting EIS, and then conduct site-specific NEPA reviews and issue ten-year grazing permit decisions for all JFO allotments (not just the 28 allotments governed by the SSA terms), which will be tiered to the revised RMP and EIS.  *See SSA* at ¶ 18.  Those permits are to be issued within 3

**Memorandum Decision and Order – Page 6**

years of the completion of the revised RMP.  *Id.*

The SSA states that the JFO RMP "is expected to be completed . . . by September 30, 2009." *Id*. at ¶ 8.  That deadline may be extended "by agreement of the parties or the Court for another year, i.e., to September 30, 2010 upon a determination that BLM is diligently proceeding with the RMP and EIS but needs additional time to complete the process." *Id*. at ¶ 9.  The BLM is presently estimating that a draft RMP will be issued on September 1, 2009, for public comment, and that the final RMP will be completed around March of 2011.  *See Testimony of Rick Vander Voet*.  That would mean that the new grazing permits would be in place around 2014 (three years from the completion of the RMP).

In the interim, and on a more specific level, the SSA imposed a general set of requirements, known as Interim Grazing Management Conditions, for the 28 allotments grazed by the intervenors.  The SSA further provided that more specific conditions would be imposed by Annual Grazing Plans that must be issued for each allotment prior to the turnout of any cattle for that grazing season.  *See SSA* at ¶ 29.

On each of these allotments where the BLM had found violations of its Rangeland Health Standards (to be discussed further below) caused by grazing, the BLM imposed curative management practices.  These management practices were carried forward into the SSA Interim Grazing Conditions and the AGPs that govern

**Memorandum Decision and Order – Page 7**

grazing each season.

To ensure that the restrictions continued to improve conditions, the parties agreed in the SSA to mandatory monitoring of each allotment by the BLM.  *See SSA* at ¶ 30.  Finally, to focus resources on range improvement rather than litigation, each side gave up some legal rights:  WWP agreed to give up its rights to appeal the BLM's determinations or begin new litigation over these 28 allotments, and the intervenors agreed to give up any right they may have to avoid the BLM's determinations by using legislative "riders."

## Termination of Case

On July 3, 2006, this Court entered an order administratively closing this case pending completion of the obligations imposed on the parties by the SSA.  The order allowed any party to petition the Court to reopen the case "to enforce the terms of the [SSA] or for other good cause."

## Analysis of the Management Situation

In March of 2007, in accordance with the SSA, the BLM issued its Analysis of the Management Situation (AMS) for the JFO-RMP.[1]  The AMS was a compilation of the data collected by the BLM in preparing the JFO RMP.  It is a

---

[1]  While the report is dated July of 2007, it is undisputed that it was actually issued in March of 2007.

**Memorandum Decision and Order – Page 8**

snapshot of conditions at that time, to be provided to the public for comment, and subject to subsequent revision by the BLM if deemed necessary because of the comments received.  The AMS is still in the public comment stage and so is not a final BLM document.  It will be discussed in more detail below, but in summary its findings indicate that sage grouse habitat on the JFO is deteriorating.

**Murphy Complex Fire**

About four months after the AMS was issued, the JFO was hit with a catastrophic wildfire that burned 425,815 acres, destroying 70% of the remaining sage-grouse nesting habitat and over 80% of the known occupied pygmy rabbit habitat.  Both animals have been designated as sensitive species by the BLM and are currently under consideration for listing under the ESA.

The fire was named the Murphy Complex Fire and will be referred to throughout this decision by its acronym, MCF.  Within just a few weeks of the MCF, the BLM responded by implementing the Murphy Complex Fire Emergency Stabilization and Rehabilitation Plans.  These plans proposed substantial amounts of seedings, weed treatments, soil stabilization treatments, fencing and monitoring. Almost 600,000 acres will be closed to grazing, to be reopened only when certain conditions are met.  *See Testimony of Vander Voet.* Grazing continues on the unburned areas of the JFO, and both Plans provide for the repair and re-building of

**Memorandum Decision and Order – Page 9**

hundreds of miles of fencing.

**Motion to Reopen This Case**

Responding to the massive destruction of wildlife habitat caused by the MCF, WWP filed a motion to reopen this case and enjoin grazing on 57 allotments, including 21 allotments covered by the SSA.  WWP argued that the destruction of habitat caused by the Murphy Complex Fire, together with the already precarious status of the sage grouse and pygmy rabbit, created an emergency that rendered the SSA inoperable and required an immediate cessation of all grazing.

The Court denied WWP's motion with regard to the 21 allotments covered by the SSA on the ground that the agreement continued to govern those allotments and prohibited WWP from pursuing litigation as to them.  With regard to the other 36 allotments, the Court granted WWP's motion to reopen the case, and allowed WWP to file an amended complaint, but denied injunctive relief, holding that "the Court needs a more detailed record as to the condition of the pastures sought to be kept off-limits from grazing and fencing."  The Court allowed WWP to re-file its motion for injunctive relief and present evidence to the Court.

**Amended Complaint**

WWP's amended complaint (entitled Revised First Supplemental Complaint) contains three counts.  The first count alleges that the BLM's post-MCF decisions

authorizing the construction and repair of fences on the 36 allotments violated NEPA and FLPMA because the actions were inconsistent with the governing RMP, failed to contain the necessary environmental analysis, and expended money and resources to protect livestock instead of sensitive species like the sage grouse.  The second count alleges that the BLM's post-MCF grazing authorizations violate NEPA and FLPMA because the fire represents a significant change of circumstances requiring a supplemental EIS.  The third count alleges that the BLM's post-MCF grazing closures of burned areas on the 36 allotments violates NEPA and FLPMA because the BLM has set forth criteria for reopening those areas to grazing without preparing any site-specific evaluation of the closures.

On April 28, 2008, the Court granted WWP's motion to consolidate this case with *Committee for the High Desert v. Guererro*, CV-02-521-S-MHW.  In that case, assigned to Judge Mikel H. Williams originally, WWP sought to enjoin grazing in four allotments in the JFO: (1) Juniper Butte; (2) Poison Creek West; (3) Poison Creek East; and (4) Kubic.  Judge Williams held that the BLM violated the Fundamentals of Rangeland Health (FRH) regulations by allowing grazing to occur on these allotments without taking any steps to cure violations of the FRH standards on these allotments.  As a remedy, Judge Williams issued an injunction along lines suggested by the BLM, that closed some pastures where grazing was affecting bull

trout and a sensitive plant species, the slickspot peppergrass, and imposing utilization and monitoring requirements in the pastures subject to grazing.

Once *Guererro* was consolidated with this case, WWP then re-filed the motion for injunctive relief that had earlier been denied.  On June 12, 2008, the Court ordered the BLM to provide (1) documents concerning the current (as of 2008) grazing authorizations for the 36 allotments, and (2) documents concerning the condition of each allotment (monitoring reports, etc.) for a period of the last ten years. *See Docket No. 214.*  The Court also set deadlines for briefing and the disclosure of expert witnesses.

## Hearings

The Court held ten days of evidentiary hearings on WWP's motion for preliminary injunction.  The Court held that any injunction that issued would apply only to the 2009 grazing season.

At the conclusion of the hearing, the parties were given additional time to submit proposed findings and conclusions.  That material was submitted on February 2, 2009.

This decision shall set forth the Court's Findings of Fact and Conclusions of Law based on that evidentiary hearing.

**Memorandum Decision and Order – Page 12**

# FINDINGS OF FACT

## Background on Sage Grouse

1.  There are two species of sage grouse in western North America: (1) the Greater Sage Grouse, and (2) its smaller relative, the Gunnison sage grouse. *See Conservation Plan* at p. 2-1 to -2.

2.  The Gunnison sage grouse is found in Colorado and southeastern Utah; the Greater Sage Grouse inhabits Idaho, and it is that species that will be referenced in this decision. *Id*. at p. 2-2.

3.  The Greater Sage Grouse is a squat feathered bird, about half the size of a turkey, grayish in color with a black belly and spiky tail feathers. It gets around mostly by walking, but is a strong flier over a short distance. It is not a fast runner, so to escape predators, it will usually either hide or fly.

4.  Sage grouse inhabit the sage steppe ecosystem found in ten western states, including Idaho, and two Canadian provinces. *See Conservation Plan* at p. 2-1.

5.  They are sagebrush obligates, and rely on sagebrush all year to provide roosting, cover and food. *AMS* at p. 308.

6.  The sagebrush-steppe (or sage-steppe) ecosystem is found across the Great Basin region generally, and in the JFO specifically.

7.     The JFO is located within the larger Great Basin region, which BLM defines

to include much of southern Idaho and northern Nevada, plus portions of

Oregon, California and Utah. *See Testimony of Pellant; Exhibit 2040.*

8.     The sage-steppe ecosystem features sagebrush in the overstory; native

grasses, forbs, and litter in the understory; and biological soil crusts filling

interspaces between vegetation.  *See Testimony of Rosentreter; Pellant; and

Braun.*

9.     During the winter months, sage grouse depend almost exclusively on

sagebrush for food.  *Id*. at p. 309.

10.    As winter turns to spring, in early March, sage grouse move to breeding areas

known as leks.  *See Guidelines to Manage Sage Grouse Populations and

their Habitat, Exhibit 76,* at p. 969-70.

11.    In Idaho, the lek season runs from about March 15 to May 1.  *See

Conservation Plan for Greater Sage Grouse in Idaho, Exhibit 108* at p. 4-

61.

12.    In establishing leks, sage grouse prefer sites with extensive cover of low

grasses, surrounded by taller sagebrush.  *Guidelines,* at p. 970.

13.    After mating, the female moves away from the lek to establish a nest.  *See

Conservation Plan* at p. 2-2.

**Memorandum Decision and Order – Page 14**

14.     The nesting season in Idaho lasts from about April 1 to June 15.  This nesting

season is critical because the sage grouse has one of the lowest reproductive

rates of any North American game bird, "and its populations are not able to

recover from low numbers as quickly as many other upland game bird

species." *See Conservation Plan* at p. 2-3.

15.     The nest is a shallow depression on the ground, usually under sagebrush.

*Guidelines* at 970.

16.     The nests established under sagebrush are more successful than nests under

other shrub species.  *AMS* at p. 308.

17.     The reason is that taller stands of sagebrush and grasses "provide scent,

visual and physical barriers to potential predators." *Guidelines,* at p. 971.

18.     Without this cover, the hen will be leading her chicks on a "death march" as

they leave the nest seeking food.  *See Testimony of Dr. Braun*.

19.     The hen and chicks require high quality forbs, which are herbaceous

flowering plants, other than grasses.  *Id.*

20.     The forbs provide good nutrition for the hen, increasing her chances of

successfully giving birth to, and raising, her chicks. *Id.*

21.     Both the hen and her chicks also feed off of insects and beetles.  *See*

*Guidelines, supra*, at p. 971.

**Memorandum Decision and Order – Page 15**

22.   An herbaceous understory provides greater access to insects and forbs by the females before breeding and by chicks.  *See Conservation Plan* at p. 2-4.

23.   The most productive sage grouse brood-rearing habitat includes a perennial grass and forb canopy cover of greater than 15% as well as a 10% to 25% canopy cover of sagebrush.  *See Conservation Plan* at p. 2-4.

24.   During summer months, the sage grouse move to wetter – mesic – sites like wet meadows and irrigated areas, as these areas will have good forb cover. *See Guidelines, supra*, at p. 971.

25.   As fall comes, and turns to winter, sage grouse migrate to winter sites, gradually eating less forbs and more sagebrush, until they are eating almost exclusively sagebrush by December.  *See Testimony of Dr. Braun.*

**Sage Grouse Numbers**

26.   Estimates of sage grouse numbers prior to the late 1950s are mostly anecdotal due to the lack of any systematic surveys.  *See Idaho Sage Grouse Conservation Plan, Exhibit 108,* at p. 1-4.

27.   Within that limitation, experts estimate that there may have been 1.1 million of the birds ranging over an area now comprising 16 western states and 3 Canadian provinces.  *See Testimony of Dr. Braun; see also,* 69 Fed. Reg. at 21486.

**Memorandum Decision and Order – Page 16**

28.    From 1965 to 2003, (1) 11 of 13 states and provinces showed "significant long-term declines in size of active leks"; (2) 8 of 10 states showed "population declines over the same time frame"; and (3) 2 of 10 states "appeared to be stable or slightly increasing." *Conservation Assessment* at p. ES-4.

29.    Only California had an increase in both the population index and lek size. *Id.*

30.    The range-wide assessment showed that "[s]age-grouse populations declined at an overall rate of 2.0% per year from 1965 to 2003." *Id.* at ES-5.

31.    The population drop was more pronounced from 1965 to 1985, a decline of 3.5%. *Id.*

32.    From 1986 to 2003, the population declined at a lower rate of .4%. *Id.* Despite the lower rate of decline, a report issued by sage grouse experts – the Conservation Assessment – concluded that "we are not optimistic about the future of sage-grouse because of long-term population declines coupled with continued loss and degradation of habitat and other factors (including West Nile Virus)." *Id.*

33.    The threats to sage grouse habitat across the west are numerous. They include the proliferation of a non-native annual grass known as cheatgrass that is spreading rapidly and replacing sagebrush. *Id.* at 7-14.

**Memorandum Decision and Order – Page 17**

34.   With regard to the Great Basin, nearly 80% of the land area is susceptible to displacement by cheatgrass.  *Id*. at p. 7-17.

35.   The increased flammability of cheatgrass causes increased fire intensity and frequency.  *Id*. at 7-14.

36.   Both the number of fires and the total area burned have increased dramatically in the last decade when compared with the past 100 years.  *Id*. at 7-70 (Fig. 7.1).

37.   Periods of drought and global climate change could further facilitate cheatgrass invasion or exacerbate the fire regime, and thus accelerate the loss of sagebrush habitats.  *Id*. at p. 7-18.

38.   The long-term result is that the increased areas burned each year coupled with decreased total area of sagebrush habitats can further accelerate the trajectory of habitat loss for sage-grouse.  *Id*. at p. 7-7.

39.   In summary, the western landscape has been subjected to a new suite of intense, frequent, or continuous disturbances.  *Id*. at p. 13-6.

40.   It is the cumulative impacts of the disturbances, rather than any single source, that may be the most significant influence on the trajectory of sagebrush ecosystems.  *Id*. at p. 13-8.

**Memorandum Decision and Order – Page 18**

**Listing of Sage Grouse**

41.     Between 2002 and 2003, the Fish and Wildlife Service (FWS) received three

petitions to list the greater sage-grouse (*Centrocercus Urophasianus*) as an

endangered species under the Endangered Species Act (ESA).

42.     On April 21, 2004, the FWS filed its 90-day finding, concluded that the

petitions present "substantial information indicating that listing the greater

sage-grouse may be warranted."  *See 69 Fed. Reg.* at 21484-94.

43.     In making that finding, the FWS relied on the declining population, the

extensive habitat destruction, and the lack of regulatory mechanisms to

protect the sage grouse.  *Id.*

*44.*    After further study, however, the FWS issued a decision on January 6, 2005,

deciding not to list the sage grouse under the ESA.  WWP challenged that

decision in this Court.

45.     The Court held that the FWS's decision-making process violated NEPA, and

the Court directed the agency to reconsider its decision finding that listing

was not warranted.  *See WWP v. U.S. Fish and Wildlife Service*, 535 F.Supp.

2d 1173 (D. Id. 2007).  The FWS is currently reconsidering that listing.

**BLM's Protection of the Sage Grouse**

46.     To protect sage-grouse from further habitat and population losses, the BLM

**Memorandum Decision and Order – Page 19**

adopted in November of 2004, a National Sage-Grouse Habitat Conservation Strategy to give management direction and guidelines to BLM Field Office staff.  *See Exhibit 19; Testimony of Vander Voet.*

47.   The BLM has also designated greater sage-grouse a "sensitive" species on the JFO and across its range, pursuant to BLM's 2001 Special Status Species Policy.  *See Exhibit 4; Testimony of Vander Voet.*

48.   The Special Status Species Policy requires that "sensitive" species be afforded, at a minimum, the same protections as candidate species for listing under the ESA; and provides that BLM Field Office managers are responsible for implementing the policy, including by "[e]nsuring actions are evaluated to determine if special status species objectives are being met."  *See Exhibit 4.*

**Sage-Grouse In Idaho**

49.   Historic populations of sage grouse in Idaho are not well documented.  *Conservation Plan* at p. 1-9.

50.   Monitoring began in 1965, and shows an overall declining trend since that time.  *See Conservation Plan* at p. 1-10.

51.   The most dramatic decline of sage grouse numbers in Idaho occurred between 1965 and 1984, when the sage grouse population declined by an average rate of 3.04% per year.  *See Conservation Plan* at p. 3-1.

**Memorandum Decision and Order – Page 20**

52.     Between 1985 and 2003, the average decline in Idaho slowed, to 1.12%
        annually.  *See Conservation Plan* at p. 3-1.

53.     In Idaho, the top four threats to sage grouse are (1) wildfire, (2)
        infrastructure, (3) annual grasses, and (4) livestock impacts.  *See
        Conservation Plan* at p. 4-3.

54.     These threats are interrelated.  *Id*.  Annual grasses like cheatgrass provide
        abundant fuel resulting in hotter and more frequent wildfires that destroy
        huge swaths of sage grouse habitat.  *See Conservation Plan* at pp. 4-5 to -6.
        Cheatgrass is spread, in part, along infrastructure like fences used to control
        livestock grazing.  The posts of these fences also provide perch sites for
        predators, and the barbed wires often injure or kill the low-flying sage
        grouse.  *See Conservation Plan* at p. 4-58.  Livestock grazing reduces the
        forbs and perennial grasses so critical during the sage grouse nesting season
        in Idaho from April 1 to June 15.  *See Conservation Plan* at p. 4-60.

**Pygmy Rabbit**

55.     Pygmy rabbit is another sagebrush-obligate species historically found on the
        JFO, that requires sagebrush for reproduction, food, cover, and other essential
        biological needs.  *See Testimony of Fite, Klott; Exhibits 44-45; Exhibit 145.*

56.     Pygmy rabbits subsist almost exclusively on sagebrush in the winter, and

**Memorandum Decision and Order – Page 21**

even in the summer when grass and forbs are available, sagebrush forms up to 50% of their diet. *See Exhibit 136 ("Effects of Cattle Grazing on Ecology and Habitat of Columbia Basin Pygmy Rabbits")* at p. 526.

57.   The pygmy rabbit has suffered substantial population losses across its range, because of sagebrush habitat losses and degradation that have also caused declines in sage-grouse populations. *Id.*

58.   BLM has thus designated pygmy rabbit as "sensitive" species under the 2001 Special Status Species Policy, including on the JFO. *Id.*

59.   Livestock grazing have the potential to harm pygmy rabbits in many ways, including by trampling their burrows; breaking and destroying sagebrush that provides food and essential cover from predators; and depleting the native bunchgrasses that are a vital component of summer diets of pygmy rabbits. *See Exhibit 136; Testimony of Fite.*

60.   Based on the declining population, and loss of habitat, WWP petitioned the U.S. Fish and Wildlife Service to list pygmy rabbit under the ESA. *See Testimony of Fite.*

61.   The Service rejected that listing petition, but its decision was reversed as unlawful by Judge Edward J. Lodge of this Court in fall 2007 and remanded. *See WWP v. Norton*, 2007 WL 2827375 (D. Idaho 2007).

62.    Upon remand, the Service published a finding in January 2008 that listing of pygmy rabbit "may be warranted" under the ESA, and it is now conducting a status review.  *See* 73 Fed. Reg. 1312 (Jan. 8, 2008).

63.    Although BLM does not have much data on pygmy rabbit populations in the JFO, its habitat declined severely in the MCF.  *See Exhibit 3015 at p. 9* (noting 80% of pygmy rabbit habitat on JFO burned in Murphy Fire].

**Slickspot Peppergrass**

64.    The JFO also has remaining populations of slickspot peppergrass (lepidium papilliferum), a rare desert flower found only in southern Idaho that has suffered significant loss of habitat and populations from 2005 to 2007.  *See Testimony of Rosentreter.*

65.    At present, the major remaining slickspot peppergrass populations are located in the JFO and the Snake River Birds of Prey National Conservation Area, although smaller, isolated populations are also known to exist in other parts of the southwestern Idaho region.  *Id.*

66.    The JFO populations of slickspot peppergrass are found in the Inside Desert, Poison Butte, Juniper Butte, and Juniper Draw allotments, which are all allotments at issue here.  *See Testimony of Vander Voet and Fite; Exhibit 43 (BLM Map of slickspot habitat areas).*

**Memorandum Decision and Order – Page 23**

67.     There are about 37,900 acres of land occupied by Slickspot in the JFO.  *See Declaration of Crane* at p. 14.

68.     Slickspot is a species that is on the verge of extinction.  *See Testimony of Rosentreter (Transcript of 10/31/08 at p. 148).*

69.     The Fish and Wildlife Service proposed to list slickspot peppergrass as a threatened plant species under the ESA in 2002.  *See* 67 Fed. Reg. 46441 (July 15, 2002).

70.     Magistrate Judge Mikel H. Williams of this Court has twice reversed subsequent decisions by the Fish and Wildlife Service to withdraw that proposed listing rule.  *See WWP v. Foss*, 2005 WL 2002473 (D. Idaho 2005) (finding that slickspot peppergrass was on "the precipice of extinction"); *WWP v. Kempthorne*, No. 07-cv-161-MHW (D. Idaho 2008), (Doc. No. 45).

71.     As a result, slickspot remains a proposed species for ESA listing at this time.

72.     In an effort to forestall listing and protect the slickspot, the BLM entered into an agreement called the "Candidate Conservation Agreement" (CCA) between ranchers, the Air Force, and the Idaho Office of Species Conservation.  *See Testimony of Rosentreter.*

73.     The CCA sets up a data center – the Idaho Conservation Data Center – to monitor slickspot populations.

**Memorandum Decision and Order – Page 24**

74.    If monitoring shows livestock trampling in a certain percentage of an occupied slickspot site, the Center will send out notice that a "trigger" has been tripped.  *See Testimony of Rosentreter.*

75.    When a trigger has been tripped, the BLM discusses with the permittee methods for avoiding future damage to the slickspot.  *See Testimony of Rosentreter.*

76.    In 2007, the Center sent about 10 "tripped trigger" notices to the BLM regarding the JFO.

77.    For each, the BLM determined that the trampling was beyond the control of the permittee, and no further action was taken.  *See Testimony of Rosentreter.*

78.    Livestock can harm slickspot peppergrass in various ways, including by promoting weed invasions, and by trampling the "slickspots," which are the plant's only habitat.  Trampling impacts are most likely to harm the plant during the spring and other times when the slickspots are wet.  *See Testimony of Rosentreter and Klott; Exhibits 16, 17, & 28 (BLM memos on grazing impacts).*

79.    For this reason, BLM's state botanist Dr. Rosentreter, who is a leading authority on slickspot peppergrass, recommends that livestock grazing not be allowed in slickspot peppergrass habitat for the period mid-February through

June each year. *See Testimony of Rosentreter (10/31/08 Tr., p. 152).*

**Condition of the JFO**

80. The JFO encompasses about 1.4 million acres of land in southern Idaho and northern Nevada. *See 1987 RMP at p. I-1; Testimony of Vander Voet.*

81. The vast majority of these lands – over 80% – are public lands operated by the BLM. *Id.*

82. About 5% are state lands and about 14% are privately owned. *Id.*

83. Despite this vast size, the JFO only contains five communities, each with a population of less than 100. *See AMS at p. 1.*

84. The JFO is located within the larger Great Basin region, which BLM defines to include much of southern Idaho and northern Nevada, plus portions of Oregon, California and Utah. *See Testimony of Pellant; Exhibit 2040.*

85. The sagebrush-steppe (or sage-steppe) ecosystem is found across the Great Basin region generally, and in the JFO specifically. This ecosystem features sagebrush in the overstory; native grasses, forbs, and litter in the understory; and biological soil crusts filling interspaces between vegetation. *See Testimony of Rosentreter; Pellant; and Braun.*

86. As explained by BLM's Idaho state botanist Dr. Roger Rosentreter, biological (or micro biotic) soil crusts are composed of tiny organisms that

play critical ecological roles in the sage-steppe. These include promoting

nitrogen fixation and nutrient cycling; protecting soils from wind and water

erosion; resisting alien plant invasions; and reducing the spread and intensity

of wildfire. *See Rosentreter Testimony.*

87.   Biological soil crusts are vulnerable to trampling and shearing from domestic

livestock, especially in the winter and spring when the crusts are moist; and

these impacts can be most pronounced around water troughs, fences, and

other areas where livestock congregate.  *See Exhibit 101.*

88.   Dr. Rosentreter noted that biological soil crusts take at least seven to nine

years to recover from the damaging effects of livestock or wildfire.  *See

Testimony of Rosentreter.*

89.   Native grass and forb communities of the sagebrush-steppe also play a

critical role in the high desert ecology, including by providing food for native

wildlife, resisting erosion and weed invasion, and providing cover habitat for

sage-grouse and other wildlife.  *Id.; Exhibit 111.*

90.   These vegetation communities are damaged by domestic livestock in various

ways, including by grazing during critical plant growth periods, which

impairs their vigor and reproductive success; trampling, breaking, and other

physical impacts; and the effects of preferential grazing, by which livestock

**Memorandum Decision and Order – Page 27**

selectively graze on certain more desirable species and thereby promote plant succession by less desirable species. *See Testimony of Braun; Pellant; see also, Exhibit 31* (Jarbidge AMS, p. 181) (noting importance of avoiding defoliation of bluebunch wheatgrass during critical growth stages).

91.   The combination of sagebrush, grasses, forbs, litter, and biological crusts in the sagebrush-steppe protects soils and resists erosion.

92.   By contrast, domestic livestock contribute to soil depletion and erosion in various ways, including by reducing native plant vigor and presence, damaging soil crusts, and exposing and disturbing soils. *Id.; Testimony of Klott and Rosentreter.*

93.   Historically, wildfires in the sage-steppe were infrequent, with sagebrush burning on an estimated 80-240 year interval. *See Testimony of Rosentreter; Exhibit 126.*

94.   The mosaic patterns associated with the sage-steppe native vegetation and biological soil crusts reduced the spread and intensity of fires. *Id.*

95.   In recent decades, however, wildfires have grown larger, hotter, and more frequent across the Great Basin, including in the JFO. *See Testimony of Vander Voet; Exhibit 19* at p. 7.

96.   The proliferation of annual invasive grasses (notably cheatgrass) is one of the

**Memorandum Decision and Order – Page 28**

leading causes of the heightened fire danger in the JFO.  *See Testimony of Vander Voet; Exhibit 111.*

97.     Cheatgrass typically becomes established in areas of soil disturbance, including along roads, fences, and livestock watering troughs; and after fires. Livestock grazing is one vector by which cheatgrass and other invasive weeds are spread into and then displace native vegetation.  *See Testimony of Braun, Pellant; Rosentreter; Exhibit 131.*

98.     The best indication of the condition of the JFO just before the MCF is contained in the Analysis of the Management Situation (AMS).  *See Exhibit 31.*

99.     The AMS was a compilation of the data collected by the BLM in preparing the JFO RMP.  It is a snapshot of JFO conditions in 2006/2007.

100.    The AMS is still a draft document.  After being provided to the public for comment, it will be revised by the BLM if revisions become necessary because of the comments received.  *See Testimony of Vander Voet.*

101.    Recognizing its limitations, the AMS still offers valuable insight into the condition of the JFO in just prior to the 2007 MCF.

102.    The AMS study indicates that between 1983 and 2006, leks dropped from 152 to 39 in the JFO.  *See AMS* at p. 148.

**Memorandum Decision and Order – Page 29**

103.  The remaining sage grouse occupy about 55% of the JFO, while the other 45% of the JFO "no longer provides habitat suitable for sage-grouse." *See AMS* at p. 308.

104.  The 55% of remaining sage grouse habitat is largely located in the southern half of the JFO where the 36 allotments at issue are located.  *See Testimony of Haak* (to be discussed in more detail below).

105.  The "best remaining population stronghold for sage-grouse" in the JFO prior to the MCF was in the southern "Foothills" area.  The largest contiguous blocks of sagebrush steppe habitat left in the JFO exist there, with Wyoming big sagebrush.  *See AMS* at p. 247.

**Grazing on the JFO**

106.  The BLM authorizes grazing of cattle and sheep on about 1.5 million acres of the JFO.  *See AMS* at p. 177.

107.  The BLM has divided the JFO into 93 grazing allotments, and authorizes grazing on those allotments by issuing a permit, typically for a 10-year period.  *See* 43 C.F.R. § 4110.2-2 (authorizing the permit system and stating that permitted livestock use "shall be based upon the amount of forage available for livestock grazing as established in the land use plan . . .").

108.  Of those 93 JFO allotments, 28 are managed under the terms of the SSA and

**Memorandum Decision and Order – Page 30**

are no longer at issue in this litigation.

109. Of those 93 allotments, 2 are managed under the terms of Judge Williams'

Court Order and are within the 36 allotments at issue here.

110. While some allotments contain a single pasture, others contain multiple

pastures.

111. All allotments are governed by permits that set out – for each of the pastures

in that particular allotment – the amount of use, specified in animal unit

months (AUMs).

112. An AUM is defined as the feed or forage required to maintain one animal

unit (a 1,000 lb cow and calf) for one month.

113. The permits also set the specific dates that cattle may be turned out on each

pasture, the conditions governing the grazing, and the specific dates when

grazing must end. *See, e.g. Exhibit 2002A.* (permit for four of the allotments

at issue here).

114. Each permit is subject to annual review and modification.

115. Each permittee receives an annual billing statement prior to livestock being

put on the allotment. *See Testimony of Vander Voet*.

116. By regulation, BLM has the authority to change an existing grazing permit if

monitoring shows degradation or unacceptable patterns of utilization. *See*

**Memorandum Decision and Order – Page 31**

*Testimony of Vander Voet (Transcript for 12/02/08 at p. 252).*  BLM does not need the agreement of the permittee to make changes, for example, following a fire in an allotment.  *Id*. at p. 126.

117.   There is flexibility within the bounds of a grazing permit for a permittee to make adjustments.  For example, if a permittee grazed fewer days than authorized on the permit he could increase the number of livestock for that shorter period of time than what is shown on the permit.  The AUMs authorized would balance out.  *See Testimony of Vander Voet (Transcript for 12/02/08 at p. 253).*

118.   Often, the BLM will include modifications in the annual grazing bill it sends to each permittee to collect the annual grazing fees.  If the BLM wants to reduce the authorized grazing, it must give notice to, and consult with, the permit holder.  *See* 43 C.F.R. § 4130.3-3.

119.   Livestock grazing occurs within the JFO "year long."  *See AMS at p. 180.*

120.   This does not mean that all areas in the JFO are being grazed at all times.  Rather, the larger ranch operations winter their cattle in the lower elevations of the northern portion of the JFO, and then gradually move the cattle southward during the spring, grazing them in the higher elevations of the south during the summer months, and then moving them back for winter.  *See*

**Memorandum Decision and Order – Page 32**

*AMS at p. 180.*

121.  To assess the impacts of this grazing, the BLM developed a set of standards

to measure the status of the soil, vegetation, riparian areas, and wildlife on

the range.  The standards are known as the Standards for Rangeland Health.

*Id*. at p. 178.

122.  The BLM has acknowledged that "[r]angelands should be meeting the

Standards for Rangeland Health or making significant progress toward

meeting the standards.  Meeting the standards provides for proper nutrient

cycling, hydrologic cycling, and energy flow." *See Idaho Standards for*

*Rangeland Health and Guidelines for Livestock Grazing Management*, at p.

3.

123.  In the 2007 AMS, the BLM reported that of the 44 allotments studied on the

JFO, 28 failed to meet some of the Standards, with livestock grazing being a

significant factor in the non-attainment.  *See AMS at p. 178.*

124.  None of the 44 allotments met all the standards, and not a single one was

making significant progress toward doing so.  *Id*.

125.  Between 1982 and 2006, the JFO lost 797,409 acres of native sagebrush-

steppe habitat – the habitat used by the sage grouse.  *See AMS at p. 308.*

126.  That means that just prior to the MCF, about 45% of the acreage in the JFO

**Memorandum Decision and Order – Page 33**

was no longer vegetated by sagebrush steppe.  *See AMS* at p. 308.

127.   That habitat decline contributed to long-term declines in numbers of active sage grouse leks and populations.  *Id*.

128.   Much of the remaining sage-grouse habitat in the JFO is "highly fragmented by wildfire, non-native perennial seedings, roads, power and telephone lines, and range infrastructure." *Id*.

129.   This highly fragmented habitat exists "throughout the northern two-thirds of the [JFO]." *Id*. at p. 151.

130.   Sage grouse have lower nesting success in fragmented habitats when compared with contiguous habitats.  *see AMS* at p. 151.

131.   The primary cause of this loss of habitat is the numerous large wildfires in the last thirty years, and subsequent rehabilitation, that have "resulted in millions of acres of sagebrush steppe converted into grasslands . . . ."

132.   The AMS also found that grazing, along with its associated water developments and fencing, is also causing destruction of sage-grouse habitat. *See AMS* at p. 181.

133.   With regard to slickspot peppergrass in the JFO, the common threats to its existence in the JFO are wildfire, weeds, and livestock grazing.  *See AMS* at p. 103, Table 29.

**Memorandum Decision and Order – Page 34**

**Murphy Complex Fire**

134.   About four months after the AMS was issued, the JFO was hit with a

catastrophic wildfire that burned about 425,000 acres in the JFO.  *See*

*Testimony of Vander Voet; See Exhibit 2074* at p.1.

135.   The fire spread over an area encompassing more than 1,000 square miles and

was "notable for . . . the nearly complete consumption of vegetation in many

places."  *See Exhibit 2074 (Report on Interactions Among Livestock Grazing,*

*Vegetation Type, and Fire Behavior in the Murphy Wildland Fire Complex).*

136.   The fire resulted from extremely hot, dry, and windy conditions.  *Id.*

137.   Because of these extreme conditions, grazing levels had little effect on the

fire's behavior.

138.   Less than 5% of the burned area was dominated by non-native grasses like

cheatgrass or medusa head.  *Id.*

139.   In the extreme conditions faced in the MCF – very hot, dry, and windy

conditions – the fire's behavior might have been influenced by a pre-fire

reduction in herbaceous biomass, but only if the reduction was to levels that

would potentially compromise sustained livestock production and ecosystem

goals.  *Id.*

140.   Under more moderate conditions, a program of targeted grazing on selected

**Memorandum Decision and Order – Page 35**

sites could affect fire behavior on those sites by reducing fuels.  *Id.*

141. "The fire had tremendous impacts to sage grouse habitat . . . and healthy sagebrush steppe habitat left within southern Idaho and northern Nevada." *See Emergency Rehabilitation Plan, Exhibit 3016 at p. 2.*

142. Sagebrush cover was eliminated on about 304,893 acres of BLM lands within the Murphy Complex.  *Id.* at p. 7.

143. This represented destruction of about 70% of the remaining sage-grouse nesting habitat within the JFO.  *See Emergency Stabilization Plan, Exhibit 3015 at p. 9.*

144. It also destroyed over 80% of the known occupied pygmy rabbit habitat.  *See Exhibit 3016 at p. 9.*

145. The MCF burned about 2,990 acres occupied by Slickspot.  *See Crane Declaration* at p. 14.  That represents about 8% of the total Slickspot acreage, which is about 37,900 acres.  *Id.*

146. This destruction of sage steppe habitat in the JFO was described as "shocking" by Dr. Braun.  *See Testimony of Braun.*

147. After decades of studying sage grouse habitat, Dr. Braun testified that the JFO is in the "worst shape" he has seen in his lifetime.  *Id.*

148. The loss in the burned areas of critical soil components that retain moisture

and provide seedling support mean that these areas will not support sage grouse in the foreseeable future.  *Id.*

149.   Since the MCF, the number of leks present in or adjacent to (within 2 miles of) the fire site in the JFO have substantially decreased.  *See Exhibit 2111.*

150.   Of 51 leks checked by the BLM in March and April of 2008 – the breeding season – no sage grouse were seen at 30 leks.  *See Exhibit 2111.*

151.   Of the 21 leks where sage grouse were observed, six had more males than previously observed while fourteen had fewer males.  *See Exhibit 2111.*

152.   The six with increases saw an increase of about 5 males per lek, while the fourteen with decreases saw a decrease of almost 17 per lek.  *See Exhibit 2111.*

153.   The BLM's report concluded that "[w]ithin the JFO sage-grouse numbers are near the lowest levels observed since the early 1990s."  *See Exhibit 2111.*

154.   After examining this document, and comparing the JFO to the Moffatt County area he had studied extensively in Colorado, Dr. Braun concluded that sage grouse populations in the JFO are "approaching tipping over to" local extirpation.  *See Testimony of Dr. Braun.*

**Emergency Stabilization & Rehabilitation Plans**

155.   Because sage brush does not re-sprout, or spread from interior islands at any

great distance or rate, the BLM concluded that they needed to replace

substantial amounts of sagebrush habitat that was lost.  *See Rehabilitation*

*Plan at p. 7.*

156.   This was one of the many goals set forth in two plans – the Emergency

Stabilization and Rehabilitation Plans – issued by the BLM just a few weeks

after the fire to promote recovery of the burned areas.

157.   The  Stabilization Plan is short-term; the Rehabilitation Plan long-term.

While the Stabilization Plan contains actions to be taken within a year of the

fire, the Rehabilitation Plan contains actions to be taken within three years of

the fire.

158.   BLM policy requires that the two plans be drafted and approved within 21

days of fire containment.  *See Testimony of Vander Voet.*

159.   Both plans were drafted by an interdisciplinary team of professional resource

managers, including experts from both the BLM and the Idaho Departments

of Fish & Game, Lands, and Agriculture.  *See Exhibit 3018.*

160.   Before adopting the two Plans, the expert interdisciplinary team reviewed

both Plans to ensure they were consistent with the programmatic Normal Fire

Emergency Stabilization and Rehabilitation Plan (NFESTRP) that had been

adopted in 2005 after a full NEPA review.  *See Exhibit 3018.*

**Memorandum Decision and Order – Page 38**

161.   The team determined that the NFESTRP, a programmatic environmental assessment that applied to southwestern Idaho, was still adequate and applied to the JFO in general and to the MCF area in particular.  *See Testimony of Vander Voet*.

162.   After reviewing the two plans under the NFESTRP, the BLM determined that because the two plans were consistent with the NFESTRP, they did not need a full NEPA review.  *See Exhibit 3018* at pp. 10-13.

163.   No party appealed either plan to the Board of Land Appeals.  *See Testimony of Vander Voet*.

## Fences

164.   The Stabilization Plan provides for the construction of 34 miles of temporary fences that will be removed at a later date when they are no longer needed to meet the Stabilization Plan objectives.  *See Testimony of Vander Voet*.

165.   The Rehabilitation Plan also directs the repair of 390 miles of permanent allotment fences.  *See Rehabilitation Plan, Exhibit* 3016, at p. 12.

166.   The fence repairs will include replacing mesh fences that tend to catch the low-flying sage grouse, and will also remove the barbed wire on the top and bottom of fences that tend to snag the birds, and replace it with smooth wire.  *See Testimony of Vander Voet.*

167.   The temporary fences will be placed as far away as possible from sage grouse leks to still provide a useful function.  *See Testimony of Klott*.

168.   No new permanent fences are proposed in either Plan.  *See Testimony of Vander Voet*.

169.   The two plans together provide for construction or repair of about 490 miles of fences.  Just prior to the MCF, there was a total of 2,012 miles of fences on the JFO.  *See AMS (Exhibit 31)* at p. 180, table 55.

170.   Thus, the two plans approved the construction or repair of roughly one-quarter of all fencing in the JFO.

171.   Boundary fences are fundamental to the BLM's ability to administer grazing permits; permits have no meaning if livestock are not restrained within an allotment boundary.  Internal pasture fences are essential for management so the permittee can rotate grazing between pastures to maintain native plant growth and other resource values.  *See Testimony of Pellant.*

172.   Fences are also important to keep livestock out of burned or reseeded areas to protect them from trampling.  *See Testimony of Pellant*.

## Restoration of Sage Brush & Forbs Through Seeding

173.   Under the Plans, over 500,000 acres will be closed, with grazing to resume only when certain criteria are met.

**Memorandum Decision and Order – Page 40**

174.    Those criteria depend either on aerial reseeding or natural regrowth.

175.    The reseeding program under the R Plan constitutes the largest sagebrush

reseeding effort the BLM has undertaken anywhere to date.  *See Testimony of*

*Pellant*.

176.    The restoration of sage brush will largely be attempted through aerial

seeding, which the BLM determined to be much more cost effective and

efficient than hand planting.  *See Testimony of Pellant and Vander Voet*.

177.    While hand planting has more success, it is significantly more expensive and

logistically much more difficult to accomplish in the remote areas of the JFO.

*Id.*

**Closure Criteria**

178.    Whether the area is reseeded or allowed to naturally recover, the burned areas

will be closed to livestock grazing until the following criteria are met:  (1)

total ground cover is greater than 80% of what is expected on the range site,

(2) over 50% of desired herbaceous perennial plants are producing seed, and

(3) monitoring indicates that the entire plant community has developed root

systems sufficient to provide soil stabilization and withstand grazing when

soils are moist.  *See Rehabilitation Plan* at p. 26.

179.    For areas that were seeded with a grass/forb mix, the following criteria must

**Memorandum Decision and Order – Page 41**

be met:  (1) 40% of the total cover must be composed of species contained in the applied seed mix or other desirable native perennial grass and forb species that have recovered since the fire.  *See Rehabilitation Plan* at p. 26.

180.   The Rehabilitation Plan provides that if this grass/forb mix criteria is not met after the third growing season, "the seeding may be considered a failure and grazing may be allowed to resume."  *Id*.

181.   If the grass/forb seeding is a failure, the BLM wants the option to try different reseeding methods, and to either allow or ban grazing depending on all the circumstances.  *See Testimony of Vander Voet*.

182.   The BLM will monitor the burned areas for three years to determine if these criteria are met.  An interdisciplinary team including experts in wildlife botany, fisheries, and natural resources will make a recommendation to the JFO Manager as to whether monitoring has shown that the criteria are satisfied.  *See Testimony of Vander Voet.*

183.   Ultimately, the decision to resume grazing lies with the JFO Manager.  *Id.*

184.   With regard to that discretion, in relation to the 4th criteria, JFO Field Manager Vander Voet was asked whether "you have the ability to just say after the third year [to] consider the seeding a failure and the objective no longer matters, we can reopen it, right?"  He answered, "May [reopen].  And

**Memorandum Decision and Order – Page 42**

again . . . after the third growing season, what we're doing is calling the

seeding a failure and that we have to look at what path we may take after that

failure.  We may try again with a similar seed mix.  We may need to try a

different seed mix.  We may need to try a different treatment in an out-year

involving herbicides or a variety of other tools in the toolbox . . . .  After

three years we're calling this particular treatment a failure, and we need to try

something else.  And we may be allowed to resume grazing.  It does not say

grazing will be allowed to resume." *See Testimony of Vander Voet*

*(Transcript for 12/02/8* at p. 179-80).

185. In other words, the failure of restoration after 3 years will not lead

automatically to a reopening of the area for grazing but could lead to new

methods of treatments and a continuation of the closure beyond the 3 year

period.

186. The closure criteria are consistent with the BLM's National Sage Grouse

Habitat Conservation Strategy dated November of 2004.  *See Exhibit 19.*

187. That Strategy states that when other management options are not sufficient to

restore habitat, "a short-term option may be livestock exclusion."  *See Exhibit*

*19* at ¶ 46, p. 22.

188. The Strategy goes on to observe that "[r]emoving livestock may not reverse

the condition of severely altered habitats and often must be combined with reseeding and other rehabilitation methods to restore appropriate sagebrush habitat." *See Exhibit 19* at ¶ 46, p. 22.

189.  The closure criteria are consistent with this Strategy because they set an initial short-term (3-year) exclusion of grazing that could be extended depending on monitoring and the success of the reseeding program.

190.  As of December 2008, the BLM had re-opened for grazing a "relatively small number of pastures that met the criteria" in the areas burned by the MCF. *See Testimony of Vander Voet*, in transcript for 12/02/08 at p. 175-76.

191.  The decision to reopen was made by Vander Voet after reviewing the recommendation of the expert interdisciplinary team that reviewed the monitoring data against the criteria listed above. *Id*.

192.  **Inside Desert & Scott Fires**

193.  The Inside Desert Fire burned about the same time as the MCF to its north, and was located entirely in the Inside Desert allotment, which is one of the contested allotments here. *See Exhibit 2017B.*

194.  The Inside Desert Fire burned about 10 acres of ground occupied by Slickspot. *See Crane Declaration* at p. 14.

195.  The Scott Fire burned about 75,000 acres, located mainly in Nevada but also

**Memorandum Decision and Order – Page 44**

in the southeastern corner of the JFO.  *See Testimony of Vander Voet; Exhibit 4003.*

196.   The Scott Fire affected two of the contested allotments here, the Bear Creek Idaho and Player Canyon allotments.  *Id.*

## Haak Analysis of Post-MCF Sage Grouse Habitat

197.   To focus on the allotments that are of particular importance to sage grouse, WWP's expert Amy Haak evaluated which areas within the JFO retained sufficient levels of habitat to warrant protection as a priority area.

198.   Haak originally identified 57 allotments that met her standard for being of particular importance to sage grouse, but 21 of those were covered by the SSA, and so only 36 are at issue in this case.

199.   She selected these priority allotments by first identifying sage grouse lek concentration areas, and then identifying remaining patches of sagebrush habitat.  *See Third Declaration of Haak* at p. 5.

200.   To identify leks, Haak used the Idaho Department of Fish & Game database. *Id*.

201.   To distinguish between different populations and a single population using multiple leks within an area, she identified clusters or complexes of leks that were a maximum of 2.5 km apart.  *Id.*

**Memorandum Decision and Order – Page 45**

202.   She relied on experts who recommend habitat protection for nesting and early brood-rearing sage grouse within 5 km of leks.  By drawing a circle of "protection" of 5 km around each active lek complex, she identified her lek concentration areas.  *Id*. at p. 7.

203.   These were primarily located in the southern half of the JFO.  *See Exhibit 88; figure 3 to Third Declaration of Haak*.

204.   If a pasture was within a lek concentration area, and it was at least 10% sagebrush, it was included as a priority pasture.  *Id.*

205.   Also selected were any pasture containing at least 5 acres of sagebrush habitat connected to one of the three large (50,000 acre) patches of sage brush.  *Id*. at p. 22.

206.   Haak based the 5 acre cutoff on the opinion of Dr. Braun who recommended that figure.  *See Testimony of Haak.*

207.   The allotments within which these priority pastures lie make up the 36 priority allotments at issue in this case.

208.   The 36 allotments are located in the southern half of the JFO.  *See Exhibit 88.*

209.   Haak's map shows that the northern half of the JFO that is not encompassed by the 36 priority allotments contains very little of the total priority sage grouse habitat in the JFO; it is the southern half of the JFO – and specifically

the 36 allotments – that contains most of the priority sage grouse habitat remaining in the JFO.  *Id.*

210.  If sage grouse habitat is to be preserved and restored in the JFO, that work must focus on the 36 allotments at issue here.

211.  Haak also examined the condition of habitat within the 36 allotments.  She used data collected by the BLM in 2006 – prior to the MCF – known as the ESI data.

212.  In the ESI, the BLM collected data that included the height and cover of native vegetation at 218 sites within the contested allotments during 2006. That data included (1) sage height; (2) sage cover; (3) grass cover; and (4) forb cover.  *See Exhibit 95.*

213.  The data was collected during just one season, which is not the typical method of conducting ESIs.  *See Testimony of Vander Voet.*

214.  The data on forbs was collected in the summer months, *see Testimony of Vander Voet*, instead of in the spring when forbs are more numerous.

215.  Haak then evaluated this data under certain criteria to determine whether it identified habitat that was "suitable," "marginal," or "unsuitable."  The criteria were originally set by the BLM's state wildlife biologist Signe Sather-Blaire.  *See Exhibit 132*.

**Memorandum Decision and Order – Page 47**

216. Sather-Blaire's goal was to standardize sage grouse habitat assessments for BLM lands.  *Id*. at p. 1.

217. She recognized that these criteria would need to be modified to reflect local conditions.  *Id*.

218. Dr. Braun modified the criteria to fit the JFO, and defined "suitable" sage grouse habitat as including 4 of the 5 following parameters: (1) sagebrush cover >15%; (2) sagebrush height >15 inches; (3) perennial grass cover > 15%; (4) forb cover > 10%; and (5) grass/forb height > 7 inches.  *See Exhibit 64; Testimony of Dr. Braun*.

219. Dr. Braun further defined the criteria for categories "marginal" and "unsuitable."  *Id.*

220. Under these criteria, only 20 of the 218 sites within the 36 allotments met the guidelines for "suitable" sage grouse habitat.  *See Exhibit 95.*

221. Of the other sites, 104 were "marginal" and 94 were "unsuitable."  *Id*.

222. Dr. Haak explained that the "marginal" sites typically had suitable sagebrush cover and height, but suffered from a lack of sufficient forb cover and/or sufficient height of grasses and forbs.  *See Testimony of Haak*.

223. The BLM's wildlife biologist on the JFO, James Klott, testified that Haak's mapping of vegetation and sage grouse lek areas on the JFO was accurate.

**Memorandum Decision and Order – Page 48**

*See Testimony of Klott.*

224.  The foremost expert on sage grouse, Dr. Clint Braun, agreed as well.  *See*

*Testimony of Braun.*

225.  While Haak had used BLM data collected in the ESI, she did not engage in

any field testing or measurement.  *See Testimony of Haak*.

**Murray & Crane Analysis**

226.  Stuart Murray did go into the field, on behalf of WWP, and using the BLM's

height/weight method, collected data in the summer of 2008 at about 24 sites

that had also been subject to data collection in the ESI.  *See Testimony of*

*Murray.*

227.  Murray's field evaluations show that for the sites he evaluated, forbs and/or

grasses did not meet the height and/or cover criteria for "suitable" sage

grouse habitat, even where sagebrush height and cover were suitable.  *Id.*

228.  However, testimony from Kenneth Crane, the BLM's Rangeland

Management Specialist in the JFO, showed that about 25% of Murray's sites

were in pastures other than the ones he identified.  *See Testimony of Crane*.

229.  Moreover, three of Murray's sites were in pastures not part of this litigation.

*Id*.  Murray's sample size was already small – he examined only 24 sites

within the 634,000 acres contained in the 36 allotments at issue here.  With

**Memorandum Decision and Order – Page 49**

his errors rendering irrelevant some of his samples, his total sample size drops even further.

230. His methodology requires a statistically valid sample size to make a projection that the results on any particular site are representative of a larger area. *See Exhibit 157 (BLM Technical Reference 1734-3)* at p. 89.

231. Murry himself testified that he was simply trying to confirm Haak's analysis and was not rendering an opinion on the condition of any particular allotment.

232. Murry is correct that the lack of a statistical analysis makes it impossible to draw any conclusion about the condition of any particular allotment from his study.

233. The BLM did their own data collection during 2007-08, measuring how much of the annual growth of grasses was utilized by livestock and other animals. *See Exhibit 2080.*

234. The data collection was done by Kenneth Crane, the BLM's Rangeland Management Specialist for the JFO. *See Testimony of Crane.*

235. In measuring utilization levels, he used the BLM's height/weight methodology set forth in the BLM's Technical Reference 1730-1. *See Exhibit 157.*

**Memorandum Decision and Order – Page 50**

236. Crane collected data on various sites within 20 of the 36 pastures. On most of the sites he studied, the utilization was below 30%. *See Exhibit 2080.*

237. According to Dr. Braun, that is one of his criteria for healthy sage grouse habitat.

238. But Crane's study – like Murray's study – is not backed up by any statistical analysis to show that the results on the sites he selected are representative of a larger area, like the pasture a particular site was located within. *See Exhibit 157.*

239. For example, Crane chose just two sites in the 4,440 acre North pasture of the Cedar Butte Eastside allotment. *See Exhibits 2044 & 2080.* The Court cannot determine if the results from those two sites are representative of the entire 4,440 acre pasture.

240. As another example, Crane chose just five sites in the 9,610 acre China Creek BLM #1 pasture of the China Creek allotment. *See Exhibits 2044 & 2080.*

241. Once again, the lack of any statistical analysis makes it impossible to say that five sites represent conditions on 9,610 acres.

242. For these reasons, Crane's study, like Murray's study, does not provide the Court with an accurate assessment of the status of any particular allotment.

**The New JFO RMP**

243.   The BLM is taking the MCF into account in its preparation of the JFO RMP. *See Testimony of Vander Voet.*  The MCF has required the BLM to rewrite Chapter III of the new RMP, the Affected Environment chapter.  *Id.*

244.   The JFO is following the BLM's National Sage Grouse Habitat Conservation Strategy in the preparation of the new RMP.  *See Testimony of Vander Voet.* Pursuant to that Plan, the BLM and the JFO have put a high priority on conserving sage grouse and habitat.  *Id.*

**Grazing Seasons of Use**

245.   To avoid conflicting with sage grouse mating, nesting and brood rearing, grazing should be limited around leks and nests to (1) periods between June 20 and August 1 (so that grazing is not occurring during the mating and nesting seasons discussed above) and between November 15 and March 1 (when plant growth has ceased for the year).  *See Exhibit 61 ("A Blueprint for Sage Grouse Conservation and Recovery)* at pp. 7-8; *Testimony of Dr. Braun*.

246.   In addition, monitoring is necessary to ensure that use of herbaceous forage is limited to about 30% of annual production to improve vegetation to meet the habitat needs of sage grouse.  *Id.*

**Memorandum Decision and Order – Page 52**

247. With regard to slickspot peppergrass, livestock grazing should not be allowed in slickspot peppergrass habitat for the period mid-February through June each year. *See Testimony of Rosentreter (10/31/08 Tr., p. 152).*

**2008 BLM-Approved Grazing on the JFO**

248. The BLM approved grazing on the JFO during the 2008 season only in unburned areas. Of the 36 allotments at issue here, 11 are closed to grazing, along with pastures on 7 more allotments, due to the MCF. The level of grazing on these unburned allotments in 2008 was approximately the same as the levels authorized before the Murphy Complex Fire. *See Testimony of Vander Voet* (stating that the post-fire grazing authorized in the unburned areas of the JFO is about the same as authorized prior to the fire).

249. The 36 allotments at issue cover 626,952 acres. *See Exhibit 2044.*

250. A little more than a third of that total – about 221,468 acres – constitute key habitat for sage grouse. *See Exhibit 2044.*

251. The identification of key sage grouse habitat was taken by the BLM from the 2005 Idaho Sage Grouse Conservation Plan. *See Testimony of Klott.*

252. Of this key habitat, the BLM authorized grazing in 2008 on 151,043 acres, or 68% of the key habitat. *See Exhibit 2044.*

253. Of those key habitat acres authorized for grazing, 112,146 acres were

**Memorandum Decision and Order – Page 53**

authorized for grazing during the spring/fall seasons (April to June 20/August 1 to November 1) most critical to sage grouse nesting and brood rearing. *See Exhibit 2044.*

254. In other words, the BLM authorized spring/fall grazing in 2008 on 74% of the key habitat acres for the sage grouse on these 36 allotments. *See Exhibit 2044.*

255. Of the 25 allotments that remain open to grazing from the original 36 allotments at issue, the BLM has authorized spring/fall grazing on 22 of them.

## CONCLUSIONS OF LAW

### Jurisdiction

1. To obtain judicial review under the APA, WWP must challenge a final agency action. See 5 U.S.C. § 704.

2. WWP has brought three claims, and thus must show a final agency action by the BLM with regard to fencing, grazing, and allotment closure criteria.

3. With regard to fencing, the BLM's decision to proceed with the Stabilization and Rehabilitation plans is a final decision, as the JFO Field Manager approved them in a Full Force and Effect Decision Record signed on September 11, 2007. *See Exhibit 3018.* The BLM does not argue otherwise.

**Memorandum Decision and Order – Page 54**

4.      With regard to grazing, the BLM argues that "there has been no new agency

actions or decisions regarding grazing on these [36] allotments."  *See BLM's*

*Proposed Findings & Conclusions* at p. 3.

5.      The BLM's regulations require that persons grazing livestock on public land

must have both a term grazing permit (typically lasting 10 years) and an

annual grazing authorization, sometimes included in the annual grazing bill

sent by the BLM to the permit holder.  *See* 43 C.F.R. § 4140.1(b)(1)(i)

(1995).

6.      The BLM authorized 2008 grazing (or decided to rest areas) for all 36

allotments at issue here, by complying with the regulation set forth above and

issuing an annual grazing authorization.

7.      Thus, the BLM has taken action.

8.      As to whether that action is final or not, the permit holders turned out cattle

to graze based on the annual authorization, and were exposed to legal

consequences if the grazing exceeded the limits set by the BLM.  *See* 43

C.F.R. § 4140.1(b)(1)(ii) (imposing civil and/or criminal sanctions for

violation of grazing permit).

9.      The BLM responds that the "BLM's routine administrative issuance of

grazing bills" cannot constitute a final agency action.  *Id.*

**Memorandum Decision and Order – Page 55**

10.     The annual grazing authorizations – whether they are done by a grazing bill

or some other form – are not a rubber-stamped ministerial act.

11.     The testimony showed that the BLM uses the annual grazing authorizations

to alter the amount of grazing allowed based on factors like the amount of

forage and the condition of the range.  *See Testimony of Vander Voet.*

12.     Thus, this case is similar to *ONDA v. U.S. Forest Service*, 465 F.3d 977, 990

(9th Cir. 2006) where the Ninth Circuit held that jurisdiction existed to

review Annual Operating Instructions authorizing grazing because they were

"discrete, site-specific action[s] representing the Forest Service's last word

from which binding obligations flow".

13.     Crucial also to the jurisdictional analysis here is the unique posture of this

case.  The JFO has recently suffered a massive loss of habitat for sensitive

species and the BLM has decided to continue grazing in key remaining

habitat.  That decision – clearly reviewable if made in a single document –

cannot be rendered immune from review simply because it was chopped up

into 36 separate annual grazing authorizations.

14.     The Court is not holding here that it has jurisdiction to review each and every

annual grazing authorization issued by the BLM under circumstances

different from those presented by this case, but limits its holding to the

**Memorandum Decision and Order – Page 56**

circumstances of this case.

## Exhaustion

15.   WWP was not required to exhaust its administrative remedies by appealing

the BLM's decisions.

16.   This Court has previously held in this case that the exhaustion requirement is

only applicable when regulations require it and render inoperative the

challenged decision during the appeal.  *See Darby v. Cisneros*, 509 U.S. 137

(1999).

17.   Here, the regulations neither require exhaustion nor render the decisions

inoperative during an appeal.  Hence WWP need not exhaust its

administrative remedies before filing suit here.

## Grazing Rider

18.   The defendants argue that the grazing rider contained in Section 325 of the

2004 Interior appropriations bill waives environmental laws and precludes

any injunctive relief.  The Court earlier rejected a similar argument regarding

Temporary Nonrenewable Permits under Section 142 of the same bill.

19.   Intervenors argue that the nonrenewable permits should be treated differently

than the renewable permits because different riders apply.  The Court

disagrees.

**Memorandum Decision and Order – Page 57**

20.     Both riders contain identical language that renewals are issued pursuant to

        "Section 402 of [FLPMA] and section 3 of the Taylor Grazing Act . . . ."

        These sections require, in FLPMA's terms, that permit issuance be

        "consistent with the governing law."  *See* 43 U.S.C. § 1752(a).

21.     Furthermore, Section 325 states that "[n]othing in this section shall be

        deemed to alter the statutory authority of the Secretary of the Interior . . . ."

        The Court previously rejected the argument that such riders divest this Court

        of jurisdiction to apply FLPMA, and the Court  reaffirms that decision here.

22.     Finally, statutory repeals by implication are disfavored.  *Tennessee Valley

        Authority v Hill*, 437 U.S. 153, 190 (1978).

23.     This rule "applies with even *greater* force when the claimed repeal rests

        solely in an Appropriations Act."  *Id.* (emphasis in original).

24.     The BLM and intervenors here are relying on a repeal by implication

        contained in an appropriations bill, a disfavored result according to

        *Tennessee Valley*.

25.     The Court therefore finds that it has jurisdiction over WWP's claims as to the

        36 allotments not covered by the SSA, and that the action is properly before

        this Court.

**Memorandum Decision and Order – Page 58**

## Standard of Review

26.  The Court's review of WWP's NEPA and FLPMA claims is governed by the Administrative Procedures Act (APA). *See Klamath Siskiyou Wildlands Center v.* Boody, 468 F.3d 549 (9th Cir. 2006).

27.  The APA states, in relevant part, that a reviewing court may set aside only agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

28.  Review under the arbitrary and capricious standard is narrow, and the Court must not substitute its judgment for that of the agency. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).

29.  Rather, the Court will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, "entirely failed to consider an important aspect of the problem," or offered an explanation "that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. at 987.

30.  The Court must "defer to an agency's determination in an area involving a high level of technical expertise." *Id*. (quotations omitted).

31.  The Court is most deferential when the agency is making predictions within

**Memorandum Decision and Order – Page 59**

the agency's field of discretion and expertise.  *Id.*

32.     In most cases, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "This standard of review is applicable to review of agency action under NEPA." *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988), amended, 867 F.2d 1244 (9th Cir.1989).

33.     However, certain limited circumstances may justify expanding review beyond the record or permitting discovery.  *Id*.

34.     One of those limited circumstances is when the Court needs to determine whether the agency has considered all relevant factors and has explained its decision.  *Southwest Center for Biological Diversity v. United States Forest Service*, 100 F.3d 1443, 1450 (9th Cir.1996).

35.     If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for background information or for the limited purpose of ascertaining whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision.  *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir.1988).

**Memorandum Decision and Order – Page 60**

36.   Here, the BLM has authorized livestock grazing and fence rebuilding
      following a catastrophic wildfire that destroyed a massive amount of habitat
      for 3 sensitive species that are currently being considered for listing under the
      ESA, without providing any record of the relevant factors it examined in that
      authorization.

37.   The Court finds that the evidence taken at the 10 days of hearings in this case
      was necessary to determine if the BLM considered all relevant factors in
      authorizing grazing and fence construction, and in setting criteria for burned
      areas to be reopened to grazing.

## Injunction Standard

38.   A plaintiff seeking a preliminary injunction must establish that he is likely to
      succeed on the merits, that he is likely to suffer irreparable harm in the
      absence of preliminary relief, that the balance of equities tips in his favor, and
      that an injunction is in the public interest.  *Winter v. Natural Resources*
      *Defense Council, Inc.*, 129 S. Ct. 365 (2008).

39.   A "possibility" of irreparable harm is insufficient; irreparable injury must be
      "likely" in the absence of an injunction.  *Id.*

40.   A preliminary injunction is "an extraordinary remedy never awarded as of
      right."  *Id.* at p. 376.

**Memorandum Decision and Order – Page 61**

41.   In each case, courts "must balance the competing claims of injury and must

consider the effect on each party of the granting or withholding of the

requested relief."  *Id.* at p. 376.

**FLPMA – Grazing**

42.   FLPMA directs the BLM to develop and maintain comprehensive Resource

Management Plans (RMPs) that govern all aspects of public land

management, including grazing administration.  *See* 43 U.S.C. § 1712.

43.   Grazing permits must be consistent with RMPs.  *See* 43 U.S.C. § 1732(a); 43

C.F.R. § 1601.0-5(b), 4100.0-8.

44.   RMPs constrain grazing permits by determining where grazing will or will

not be allowed and by setting environmental standards that all grazing

permits must meet.  *Id*. at § 1732(a) (requiring management to be "in

accordance with the [RMPs]");  § 1752(c)(1) (conditioning renewal of

grazing permits on lands remaining available for grazing in accordance with

RMPs).

45.   While outdated, the 1987 RMP continues to govern the JFO.

46.   Livestock grazing is one of the central uses of the JFO authorized by the

1987 RMP.

**Memorandum Decision and Order – Page 62**

47.   The 1987 RMP authorizes 149,650 AUMs[2] across the JFO, and further

authorized an increase over 20 years to 280,501 AUMs, assuming that

"additional forage will be produced over the 20 year period" due to

improved range conditions for livestock.  *See 1987 RMP-ROD* at p. I-7.

48.   That increased grazing would not be authorized, however, if monitoring

showed that range conditions were not improving: "[i]ncreased use would not

be authorized unless monitoring studies indicate that the basic soil,

vegetation and wildlife resources are being protected and additional forage is

available."  *See 1987 RMP-ROD* at p. I-7.

49.   The ROD drives this point home:  "[W]ildlife goals and watershed needs will

be satisfied prior to allowing increases in livestock use."  *See 1987

RMP/ROD* at p. I-3.

50.   To satisfy wildlife needs in the event of a conflict with grazing, adjustments

"will" be made:  "If monitoring studies indicate that allotment or multiple use

area objectives are not being met, then management actions will be adjusted

accordingly.  This may include adjusting livestock seasons of use, livestock

---

[2]  The 1987 RMP authorized about 176,976 AUMs, *see 1987 RMP-ROD* at p. I-3 – but in
1991, portions of the JFO were transferred to another Field Office and the total baseline AUMs
authorized in the JFO dropped to 149,650.  *See AMS (Exhibit 31)* at p. 177 n. 18.

**Memorandum Decision and Order – Page 63**

stocking levels or the grazing system being used." *Id*. at p. D-8.

51.    The wildlife protections in the 1987 RMP were not intended to be fringe or

inconsequential provisions.  Indeed, the RMP as proposed was revised in the

final approved version to "provide additional protection for wildlife habitat,"

and to reduce grazing to "provide additional forage for wildlife."  *See 1987*

*RMP-ROD* at pp., I-2, -3.

52.    The draft RMP was also beefed up with regard to imperiled species.  While

the initial draft of the document "inadvertently" left out provisions regarding

threatened, endangered, and sensitive species, the BLM thought those

provisions important enough that they included them – and "emphasized"

them – in the final draft approved in the ROD.  *See 1987 RMP-ROD* at p. I-8.

53.    The 1987 RMP contains a clear requirement – not a mere suggestion – to

protect sensitive specie plants: "Adjustments to livestock use levels, grazing

seasons, seasons-of-use or other management techniques will be used to

protect plants."  *See 1987 RMP* at p. II-82 (in section entitled "Threatened,

Endangered, and Sensitive Plants").

54.    As to listed and sensitive species of wildlife, the 1987 Plan directs the BLM

to "[p]rotect and enhance endangered, threatened and sensitive species

habitats in order to maintain or enhance existing and potential populations

**Memorandum Decision and Order – Page 64**

within the planning area."

55.    This "protect and enhance" language is entirely consistent with the BLM's

own Special Status Species Management Policy, *see Exhibit 4*, that directs

BLM managers to use "all methods and procedures which are necessary to

improve the conditions of [sensitive] species . . . and their habitats to a point

where their special status recognition is no longer necessary." *See Exhibit 4*

at p. .01.

56.    After all, the BLM designates species as "sensitive" in part because the

species are found on BLM-managed land and the BLM "has the capability to

significantly affect the conservation status of the species through

management." *See Exhibit 4* at p. .06C1.

57.    In this case, the BLM is (1) preparing a new EIS and RMP that will address

remedies for the catastrophic loss of habitat for sensitive species, and (2)

committing to issuing new grazing permits based on that revised RMP.

58.    Those new permits will not be issued until about 2014, assuming everything

goes according to schedule, raising the issue as to what action the BLM

should take in the interim.

59.    The BLM will be annually authorizing grazing during this interim period.

60.    In its annual authorizations, the BLM is directed by the 1987 RMP (1) "to

**Memorandum Decision and Order – Page 65**

maintain or enhance existing and potential populations [of the sensitive species] within the planning area" and (2) to ensure that "[W]ildlife goals and watershed needs will be satisfied prior to allowing increases in livestock use."

61.     The BLM has interpreted these requirements in the 1987 RMP as mere suggestions.

62.     To some degree, this BLM interpretation is a litigation position entitled to no deference, *see Martin v. O.S.H.R.C.*, 499 U.S. 144, 156-57 (1991), because the BLM itself, in the 2007 AMS stated that the "1987 RMP prohibited any actions that would adversely affect the habitat of Sensitive, Candidate or Endangered species in that area." *See AMS (Exhibit 31)* at pp. 153-54.

63.     That interpretation in the AMS by the BLM is consistent with its own Special Status Species Management Plan, *Exhibit 4*, quoted above, that directs BLM managers to use "all methods" to "improve the conditions" of sensitive species.

64.     But even assuming that the BLM has long and consistently interpreted the 1987 RMP's protections for sensitive species as mere suggestions, that interpretation is not controlling if "plainly erroneous." *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (emphasis added).

**Memorandum Decision and Order – Page 66**

65. The BLM's interpretation conflicts with the plain language of the 1987 RMP, as discussed by the Court above, and is hence plainly erroneous and not entitled to deference.

66. The erroneous interpretation by the BLM led it to conclude that despite the massive loss of habitat in the MCF, they can maintain grazing at pre-MCF levels and seasons-of-use on the unburned allotments.

67. In those grazing authorizations for 2008, the BLM maintained the same level of grazing on the unburned allotments as prior to the MCF – despite the catastrophic loss of habitat for sensitive species – and also authorized substantial grazing during seasons for sage grouse mating, nesting and brood-rearing on 74 % of the key habitat acres for the sage grouse in the 36 allotments at issue here. *See Findings of Fact*.

68. On some allotments, the BLM authorized grazing at levels above even the 20 year level approved by the 1987 RMP. For example, the Cedar Butte #10 allotment permit for 2008 authorizes 891 AUMs but the 20-year level in the 1987 RMP only authorizes 620 AUMs. Likewise, the Conover allotment permit for 2008 authorizes 4205 AUMs but the 20-year level in the 1987 RMP only authorizes 3974 AUMs. *See 1987 RMP* at pp. D-9, -10; *Exhibit 2044.*

**Memorandum Decision and Order – Page 67**

69.     The 20-year levels in the 1987 RMP were based on an assumption that forage would be improved from the 1984 levels but the catastrophic loss of habitat in the MCF makes that impossible.

70.     There will be at least 6 grazing seasons between now and the date the new permits are issued based on the new RMP.

71.     This is an exceedingly long time given the crisis in habitat for the sensitive species of sage grouse, pygmy rabbit, and slickspot.

72.     The large scale habitat loss exacerbated by the MCF requires – under the terms of the 1987 RMP – that grazing-as-usual cannot continue in the unburned areas. *See also Guideline to Manage Sage Grouse Populations and their Habitats (Exhibit 76* at p. 978) ("[i]n areas of large-scale habitat loss ($\geq$ 40% of original breeding habitat) protect all remaining habitats from additional loss or degradation").

73.     The 2008 grazing authorizations show that the BLM allowed grazing as usual in the unburned areas with very little attempt to maintain and enhance these diminishing key sage habitat areas.

74.     Moreover, the 2008 grazing authorizations show that the BLM continued to allow substantial grazing in key sage grouse habitat during critical seasons of mating, nesting, and brood-rearing.

**Memorandum Decision and Order – Page 68**

75.   Given the protections for sensitive species set forth in the 1987 RMP, as discussed above, the BLM must apply a more rigorous standard to grazing authorizations in the interim years before the new RMP is completed.

76.   Going forward, with the 2009 grazing authorizations and thereafter, the BLM must abandon the grazing-as-usual model used in the 2008 authorizations, and modify grazing levels and seasons-of-use in the unburned areas to (1) "to maintain or enhance existing and potential populations [of the sensitive species] within the planning area" and (2) to ensure that "[W]ildlife goals and watershed needs will be satisfied prior to allowing increases in livestock use." *See 1987 RMP.*

77.   The Court is confident that the BLM will comply with this new direction in its grazing authorizations so that the Court does not need to intervene at this time to issue the total ban on grazing requested by WWP.

78.   The Court will, however, retain jurisdiction to ensure that its interpretation of the 1987 RMP is carried forward by the BLM in the coming grazing authorizations.

**FLPMA Review – Fencing**

79.   The 1987 RMP states that "[e]xisting fences will be modified where specific wildlife needs are not being met.  All new fences will be built to allow for

**Memorandum Decision and Order – Page 69**

wildlife passage." *See 1987 RMP* at p. II-83.

80.    Neither this provision, nor any other, prohibited the BLM from taking the emergency action of repairing existing fences and constructing temporary fences as set forth in the Stabilization and Rehabilitation Plans.

81.    The massive destruction caused by the MCF required the BLM to quickly repair existing fences and construct temporary fences to protect seeded areas, and to control livestock so they did not roam onto roads, burned areas, and pastures where they did not belong.

82.    The Rehabilitation Plan specifically referenced the provision in the 1987 RMP concerning fences quoted above, and stated that "[n]o new permanent fences are proposed.  Permanent fence repair will include measures for bringing fences up to wildlife standards." *See Rehabilitation Plan (Exhibit 3016)* at p. 4.

83.    Testimony at trial showed that the BLM modified the fences to address the needs of sensitive species by (1) having the fencing reviewed by an interdisciplinary team that included wildlife experts; (2) replacing mesh fences that tend to catch the low-flying sage grouse; (3) removing barbed wire and replacing it with smooth wire on some fences; and (4) locating fences as far as possible from sage grouse leks.

**Memorandum Decision and Order – Page 70**

84.   While WWP complains that about $2 million was spent on fencing but only a

few $100,000 on planting sage brush seedlings.  But expert testimony

showed that planting sage brush seedlings was very expensive (nearly four

times the expense of aerial seeding), and was impractical to restore the huge

areas destroyed by the MCF.  *See Testimony of Pellant & Vander Voet.*  The

BLM made this decision based on its expertise and the Court defers to that

expertise.  *See McNair, supra.*

85.   For all these reasons, the Court finds that WWP is not likely to prevail on its

claim that the BLM's fencing decisions violated FLPMA.

**FLPMA Review – Closure Criteria**

86.   The 1987 RMP contains no specific guidance on allotment closure and

reopening criteria.

87.   The provisions of the 1987 RMP on wildlife and sensitive species, quoted

above, govern the closure criteria.

88.   The BLM did not make any erroneous interpretation of the 1987 RMP in

forming the closure criteria.  Those criteria were established – and will be

applied – by an interdisciplinary team of experts, including a wildlife

biologist and a fisheries biologist making recommendations to the Field

Manager.

**Memorandum Decision and Order – Page 71**

89.     WWP argues that the closure criteria are inadequate because they fail to

        include any sagebrush recovery objective, such as requiring one live

        sagebrush plant per square meter in areas re-seeded with sagebrush, as

        adopted following the Clover Fire.  They argue as well that the closure

        criteria will permit premature livestock access to the burned areas, causing

        soil erosion and trampling of soil crusts and young sagebrush saplings.

90.     However, there is nothing in the 1987 RMP that specifically dictates that a

        sagebrush recovery objective be included in the closure criteria.

91.     While the 1987 RMP provisions protecting habitat, quoted above, apply to

        the closure criteria, the BLM's own experts will be reviewing whether the

        criteria protect habitat, and it is these experts that will be making a

        recommendation to the Field Manager as to whether areas should be

        reopened.

92.     Moreover, the closure criteria are consistent with the BLM's National Sage

        Grouse Habitat Conservation Strategy.  *See Findings of Fact.*

93.     WWP takes issue with the BLM's experts by offering the testimony of their

        own experts, but the BLM is entitled here to rely on its own experts.  *See*

        *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008).

94.     One of those BLM experts – Jim Klott, a BLM wildlife biologist who has

**Memorandum Decision and Order – Page 72**

studied sage grouse in the JFO and is on the closure criteria interdisciplinary

team – was described by WWP's own expert, Dr Braun, as a "fine biologist."

*See Testimony of Braun* (*Transcript for 10/29/08* at p. 228).

95.   Moreover, the criteria do not guarantee that grazing will continue after 3

years even if the restoration fails, because, as JFO Field Manager Vander

Voet testified, other methods of restoration may be attempted that would

result in the continued closure of the allotments beyond the 3 year period.

*See Findings of Fact.*

96.   For these reasons, the Court finds that WWP is not likely to prevail on its

claim that the reopening criteria violate FLPMA and hence are arbitrary and

capricious under the APA.

## NEPA Review – Grazing & Fences

97.   WWP argues that the BLM has violated NEPA by failing to conduct a full

NEPA review of the annual grazing authorizations on the 36 allotments at

issue, and the Stabilization and Rehabilitation Plans.

98.   NEPA requires federal agencies "to the fullest extent possible" to prepare an

environmental impact statement (EIS) for "every . . . major Federal actio[n]

significantly affecting the quality of the human environment."  *See* 42 U.S.C.

§ 4332(2)(C) (2000 ed.).

**Memorandum Decision and Order – Page 73**

99. Under NEPA, agencies must take a "hard look" at direct, indirect, and cumulative impacts of their proposed actions, as well as reasonable alternatives. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004).

100. NEPA requires agencies to prepare a new or supplemental Environmental Impact Statement (EIS) when "significant" new information arises, or a material change in circumstances occurs. *See* 40 C.F.R. § 1502.9(c)(1)(ii) (requiring new or supplemental EIS to address significant new information); *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 561 (9th Cir. 2006) (major fires constituted change in conditions requiring supplemental NEPA analysis).

101. NEPA also requires the agency to consider cumulative impacts, which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions. *See* 40 C.F.R. § 1508.7; *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005).

102. The agency must provide "useful analysis" of cumulative impacts, including "some quantified or detailed information" about past and future projects. *Kern v. U.S. Bureau of Land Management*, 294 F.3d 1062, 1075 (9th Cir. 2002).

103. The NEPA "hard look" at impacts and alternatives must be taken before an agency makes a decision, not after. *See Churchill County v. Norton*, 276 F.3d 1060, 1072-73 (9th Cir. 2001).

104. All parties agree that the MCF constituted a material change in circumstances requiring a new EIS.

105. That new EIS must consider the cumulative impact of livestock grazing and fencing together because they are related actions.

106. The BLM is currently preparing an EIS that considers the environmental impacts of livestock grazing and fencing, among many other things. *See Testimony of Vander Voet.*

107. When the new RMP is complete, the BLM will conduct site-specific NEPA reviews and issue new ten-year grazing permits for all JFO allotments. *See SSA* at ¶ 18.

108. These new ten-year permits are to be issued within 3 years of the RMP. *Id.*

109. The final RMP is due in 2011, and so the permits would be issued in 2014.

110. Thus, if everything goes according to schedule, grazing will continue under the existing permits for another 6 grazing seasons.

111. WWP is essentially demanding that the BLM prepare an EIS-within-an-EIS to govern the next 6 grazing seasons or so until the new RMP and term

**Memorandum Decision and Order – Page 75**

permits are completed.

112.   WWP cites no authority for compelling an agency to simultaneously prepare
two EISs, and the burden would be so great on an already overloaded agency
that the task would be impossible to perform.

113.   Even if it could be performed, the task would take additional years to
complete due to the delay inherent in preparing simultaneous reports,
defeating the goal of WWP to quickly get an updated analysis to govern
grazing over the next 6 grazing seasons.

114.   WWP has not explained how that interim updated analysis could be imposed
under NEPA other than by the far-fetched remedy of ordering the BLM to
simultaneously prepare two EISs, a remedy so unrealistic that it must be
rejected.

115.   For all these reasons, the Court finds that WWP is not likely to prevail on its
claim that NEPA requires the BLM to conduct a separate environmental
analysis of its annual grazing authorizations and fencing decisions on the 36
allotments at issue.

**NEPA & Closure Criteria**

116.   The same analysis applies to WWP's claim that the BLM should have
conducted a NEPA analysis of the closure criteria.

**Memorandum Decision and Order – Page 76**

117. For the same reasons, the Court finds that WWP is unlikely to prevail on its claim that the BLM should have conducted a NEPA analysis of the closure criteria.

**Judge Williams' Injunction**

118. WWP seeks to set aside the injunction in the companion case of *Guerrero* discussed above, and the permit holders subject to that injunction (Bracketts) have filed a motion for summary judgment seeking to maintain the injunction.

119. WWP seeks to set aside the injunction that allows some grazing under strict restrictions on the ground that grazing should be completely banned in the two allotments at issue, Inside Desert and Poison Butte.

120. The Court has already denied WWP's request to totally ban grazing.

121. The Court finds no evidence that the restrictions imposed by Judge Williams in *Guerrero* are not being followed or are insufficient to protect the sensitive species at issue here.

122. For these reasons, the Court will deny WWP's request to lift the injunction and ban grazing, and will grant the Bracketts' motion for summary judgment.

**WWP's Motion in Limine**

123. WWP claims that certain experts named by the BLM and intervenors failed to

**Memorandum Decision and Order – Page 77**

provide sufficient summaries of their expected testimony.

124.   Due to the unique circumstances of this case, the Court did not require Rule

26 expert reports, but required merely summaries of testimony, as many of

the potential experts were already well-known to both sides.

125.   For that reason, the Court cannot find that the summaries provided were so

inadequate that they warrant exclusion, and WWP's motion will accordingly

be denied.

## ORDER

In accordance with the Findings of Fact and Conclusions of Law set forth

above,

NOW THEREFORE IT IS HEREBY ORDERED, that WWP's motion for

preliminary injunction (Docket No. 203) is GRANTED IN PART AND DENIED

IN PART as set forth above.  It is denied to the extent it seeks a ban on grazing or

any specific restrictions on grazing, but is granted to the extent that the BLM is

enjoined from interpreting the 1987 RMP in any manner other than imposing

requirements (1) to maintain or enhance existing and potential populations of the

sensitive species within the planning area, and (2) to ensure that wildlife goals and

watershed needs will be satisfied prior to allowing increases in livestock use.

IT IS FURTHER ORDERED, that Brackett's motion for summary judgment

**Memorandum Decision and Order – Page 78**

(Docket No. 224) is GRANTED regarding the Inside Desert and Poison Butte allotments covered by the injunction in the companion case of *Guererro*, and the injunction in *Guererro* issued by Judge Williams will accordingly remain in place.

IT IS FURTHER ORDERED, that WWP's motion to vacate and dissolve Judge Williams' April 11, 2003 injunction (Docket No. 141) (in the companion case of *Committee for High Desert v. Guerrero, CV-02-521-S-BLW*) is DENIED.

IT IS FURTHER ORDERED, that the motion to intervene (Docket No. 218) is GRANTED.

IT IS FURTHER ORDERED, that the Bracketts' motions for summary judgment based on jurisdiction (Docket Nos. 222 and 223) are DENIED.

IT IS FURTHER ORDERED, that Y-3 II's motion to dismiss (Docket No. 227) is DENIED.

IT IS FURTHER ORDERED that the Brackett's motion for partial summary judgment (Docket No. 228) is DENIED.

IT IS FURTHER ORDERED, that Brackett's motion for partial summary judgment (Docket No. 228) is DENIED.

IT IS FURTHER ORDERED, that the BLM's motions for summary judgment (Docket Nos 229, 230 and 231) are GRANTED IN PART AND DENIED IN PART.  They are denied as to their jurisdictional challenges and are granted to

**Memorandum Decision and Order – Page 79**

the extent they seek summary judgment on WWP's request for a total ban on grazing.

IT IS FURTHER ORDERED, that the BLM's motion to dismiss on jurisdictional grounds (Docket No. 233) is DENIED.

IT IS FURTHER ORDERED, that the motion to vacate hearing and for site visit (Docket No. 266) is DENIED.

IT IS FURTHER ORDERED, that WWP's motion in limine (Docket No. 298) is DENIED.

IT IS FURTHER ORDERED, that the Brackett's motion in limine (Docket No. 301) is DENIED.

IT IS FURTHER ORDERED, that the BLM's motion to supplement its exhibit list (Docket No. 308) and its motion to amend its exhibit list (Docket No. 316) are GRANTED.

IT IS FURTHER ORDERED, that the Brackett's motion to strike (Docket No. 195) is DEEMED MOOT.

IT IS FURTHER ORDERED, that the Brackett's motion to reconsider the Court's jurisdictional rulings (Docket No. 205) is DENIED.

IT IS FURTHER ORDERED, that the Brackett's motion for entry of judgment as to the 21 SSA allotments (Docket No. 207) is DEEMED MOOT by the

**Memorandum Decision and Order – Page 80**

filing of WWP's amended complaint that withdraws any challenge to the 21 SSA

allotments.



DATED:  **February 26, 2009**

B. LYNN WINMILL
Chief Judge
United States District Court